DECISION
This is an appeal by defendant-appellant, Travis L. Golden, from a judg-ment of the Franklin County Court of Common Pleas following a jury trial in which defendant was found guilty of murder and improperly discharging a firearm.
On July 20, 2000, defendant was indicted on one count of aggravated murder, in violation of R.C. 2903.01, and one count of improperly discharging a firearm at or into a habitation or a school, in violation of R.C. 2923.161. The indictment arose out of the shooting death of Erskine James Hamber, on June 29, 2000.
The matter came for trial before a jury beginning February 13, 2001. The first witness for the state was William B. Huff, Jr. In June 2000, Huff resided at the Berwick Court Apartments, Apartment K, on East Livingston Avenue. On June 29, 2000, at approximately 4:00 p.m., Huff, who resided in a second-floor apartment, came home from work and was inside his apartment when he heard someone knocking on the door of his neighbor, Hamber, who resided in Apartment J. The individual knocking on Hamber's door said, "let me in," but Hamber told him to "[g]o away." (Tr. at 34.) Approximately five minutes later, Huff heard footsteps coming down the stairs and then he heard a gunshot. Huff fell to the floor and waited about five or ten minutes before getting up to look out the window. Huff observed defendant and another individual walking across the courtyard toward an opening leading to the nearby Colonial Village Apartments. Defendant was "[l]ooking back up towards the apartment and putting his hand back in his shirt and put his shirt down and walked away, him and the other gentleman he was with." (Tr. at 38.)
A few minutes later, Huff opened the door and went outside. A lady was standing at the door and told him to dial 9-1-1 because someone had been shot. At the time, Huff did not know the woman, who was identified at trial as Deborah Yvonne Adams. Huff later observed Adams walk across the courtyard in the same direction defendant walked. Huff phoned for assistance, and he then looked inside his neighbor's apartment and saw blood on the floor. Prior to the shooting, Huff had seen defendant on a few occasions, and he knew defendant by the nickname "T-Bird." (Tr. at 37.)
Columbus Police Officer Jimmy Harrell testified that on June 29, 2000, he and his partner, Officer Shearer, were dispatched to 3686 Livingston Avenue at approximately 4:30 p.m. When they arrived at the scene, a woman told them that "her son was inside and somebody * * * shot her son, * * * and that somebody had jumped out the back bedroom window." (Tr. at 61.) The officer entered Apartment J and observed a black male lying on the floor, near the door, in a pool of blood. The woman told the officers that "she was lying inside the bedroom, somebody came through the bedroom, jumped out the back window, and she came out to see what was going on. She heard this bang and there her son lay." (Tr. at 61.) Medical personnel arrived a short time later and pronounced the victim dead. Officer Harrell noticed evidence of drug usage, including a crack pipe, inside the apartment.
At the time of the incident, Willie Hodges was a resident of the Colonial Village Apartments, and he was an acquaintance of the shooting victim. Hodges also knew defendant, who he referred to by his nickname, T-Bird.
On the day of the shooting, Hodges was at the Berwick Apartments putting tires on his vehicle. Hodges later went to Hamber's apartment and asked to use the restroom. Hamber invited him to have some beer. A woman named "Mousie" and a man named Matt were also in the apartment. Hodges later learned that Hamber's mother was also in a back bedroom of the apartment.
Hodges subsequently heard a knock on the door, and he then heard defendant's voice talking to Hamber. Defendant was asking Hamber about a shirt. Hamber told defendant, "[m]an, I got your shirt." (Tr. at 79.) Defendant was then given a shirt and left the apartment. Matt and Mousie left the apartment approximately two or three minutes after defendant.
Approximately fifteen minutes later, defendant returned to the apartment. Hamber said to defendant, "[w]ell, what is wrong now? I gave you the damn shirt." (Tr. at 80.) Defendant responded, "I didn't like the way you talked to me." (Tr. at 80.) Hamber then asked, "[w]hat you going to do, are you going to shoot me? Go ahead and shoot me." (Tr. at 80.) Hodges testified that, "[t]he next thing I know I hear a shot and I left." (Tr. at 80-81.) Hodges jumped out of a bedroom window, explaining that, "I thought maybe I would get shot too to keep from being a witness or whatever, so I jumped out of the window." (Tr. at 82.)
Columbus Police Detective Phillip Walden collected evidence at the crime scene, including a 9mm shell casing that was found on the first-floor level of the apartment in the courtyard.
Lee Gill, currently an inmate, testified on behalf of the state. Gill stated that he met defendant in the "early '90s" through a friend. (Tr. at 133.) On December 8, 2000, Gill was in the Franklin County Jail at the same time defendant was being detained there. Defendant recognized Gill and they conversed. During one of their conversations, defendant related facts about the shooting. Defendant told Gill that he and another individual, James Hamber, were feuding about a crack house. Defendant told Gill that he wanted to go to Hamber's apartment to get some clothes, and that he also "wanted to go serve a hit, which is service somebody some crack as he used it." (Tr. at 137.)
When defendant arrived, Hamber did not let him inside the apartment because there were other individuals inside at the time. Gill then gave the following testimony:
 So at that point they had words. Travis said he walked down the steps. He said something, dude said something to him, James said something to him. He's like "What you say?" Dude said, "We ain't got much to talk about". Travis said, "Yes, we do. You still owe me money". At that point I guess the guy said something else. He said he whipped out his gun. That's when he headed back to the house and he reached up and shot him. [Tr. at 137-138.]
According to Gill, Hamber was aware that defendant had a weapon, because "[t]he gun was slipping out of Travis' crotch area and James said, `Are you going to shoot me?' T-Bird is like, `I don't need to shoot you. I can work.'" (Tr. at 138.) Defendant had a girlfriend named Angel, and defendant told Gill that, after the shooting he went to the nearby residence of Angel's aunt, who he identified as Aunt Debbie. Defendant "didn't know if he shot the guy James or if he had hit him or not, so he sent her Aunt Debbie over to the guy's house to see what was going on." (Tr. at 139.) Debbie went over to the apartment and the door was cracked; she noticed the body on the floor, and came back and told defendant that, "the dude got hit." (Tr. at 139.) Defendant later learned that an individual named Matt had been in Hamber's apartment on the date of the incident. Defendant also indicated to Gill that someone named Willie was in the apart-ment during the shooting, and defendant heard that Willie supposedly jumped out the window during the incident.
Defendant told Gill that he was going to give the weapon "to some dude to take to Detroit to get rid of it." (Tr. at 142.) Gill thought defendant was referring to defendant's brother. Defendant told Gill that the weapon was a 9mm semi-automatic. Defendant also told Gill that he did not think that a shell casing that was found at the apartment was from his weapon because it was found on the other side of the courtyard from where the shooting occurred.
Gill further testified that he observed defendant at the jail with a witness list, and that defendant was "looking through the phone books trying to get their telephone number." (Tr. at 147.) Defendant told Gill that he had contacted "Matt's people." (Tr. at 147.) Someone at Matt's house told defendant that Matt was out of town. Defendant also showed Gill and other inmates discovery photos of the crime scene. Based upon one of the conversations Gill had with defendant during that time, Gill had the impression that the weapon used in the shooting might be in the trunk of a car.
Matthew Williams was a friend of the shooting victim, Hamber. Williams and Hamber had smoked "dope" together in the past. (Tr. at 170.) Williams also knew defendant, and he had previously purchased crack cocaine from defendant.
On June 29, 2000, Williams was at Hamber's residence "[g]etting high with James." (Tr. at 172.) Willie Hodges, Mousie, and Hamber's mother were also at the apartment. Mousie eventually left the apartment.
Later, defendant knocked on the door, and he and Hamber began arguing about a shirt. Hamber would not let defendant inside, but Hamber told Williams to get the shirt for defendant, which he did. Williams then left the apartment and went across the courtyard to a nearby apartment of an individual named Rob. Rob and "a couple of other people" were in the apartment, including a woman named Debbie. (Tr. at 174.) Williams heard what appeared to be defendant and Hamber arguing. Debbie also heard them arguing, and she "jumped up and tried to get out of the house to try to calm him [defendant] down." (Tr. at 176.) Williams heard Debbie say, "T-Bird," but "by the time we got to the door a shot rang off, and by the time we got out there T-Bird was walking down towards my left." (Tr. at 175.) Debbie went outside and ran up to defendant and they "started to walk the opposite way." (Tr. at 176.)
Williams went up to Hamber's apartment and attempted to open the door, but he could not push it open. Defendant told Debbie to go to Hamber's apartment and "see what was going on." (Tr. at 178.)
Williams testified that he initially did not tell police officers the truth about the incident because of "[l]ife threatening situations." (Tr. at 182.) Williams stated that he was "scared of being around that area and the guys that know him that would harm me or my people." (Tr. at 182.) Williams further stated that defendant once placed a phone call from the jail and left a message with Williams' mother or stepfather that made Williams feel threatened.
Dr. Patrick Fardal, an employee with the Franklin County Coroner's Office, conducted an autopsy of Hamber on June 30, 2000. Hamber suffered a gunshot wound in the center of his forehead, approximately three inches down from the top of the forehead. Dr. Fardal stated that the wound had a "peculiar squared-off appearance to it which is kind of unusual for gunshot injuries." (Tr. at 202.) Dr. Fardal recovered a "copper-jacketed slug" from the victim's skull. According to Dr. Fardal, the bullet was "conformed in some way to cause this peculiar squared-off area." (Tr. at 203.) Dr. Fardal, who visited the crime scene, noted that there was a bullet hole through the door, and he stated that a bullet "could be deformed by passing through the door," thereby accounting for the peculiar appearance. (Tr. at 204.) Dr. Fardal testified that the victim "died solely and exclusively as a result of a gunshot wound to his head with perforations of his skull and brain." (Tr. at 206.)
Mark Hardy is a criminalist with the Columbus Division of Police. Hardy opined that a bullet fragment recovered from the victim's body was fired from a "Highpoint" 9mm weapon. (Tr. at 227.)
Thomas Reed is currently an inmate in an out-of-state institution on a drug-related charge. Prior to his current incarceration, Reed spent time in the Franklin County Jail in a cell with a number of other individuals, including defendant. During this time, defendant told Reed he was involved in a shooting. Defendant told Reed that an individual owed him some money. According to Reed, defendant "went there to get it, and he said that when he knocked on the door that the guy seen he had a gun down his side. He said the guy tried to shut the door, and he said that he fired twice up like this and then he took off." (Tr. at 248-249.) Defendant indicated that "he fired up like this * * * aiming towards the head." (Tr. at 253-254.) Defendant later learned that the victim had died, "and that's when he was like he didn't give an F, that it was God calling him, it was his time to go." (Tr. at 249-250.)
Defendant told Reed that he used a 9mm Highpoint weapon during the incident. Defendant indicated that he had given the weapon to his brother to sell, but that he was going to "tell him to take it apart and get rid of it." (Tr. at 249.)
The sole witness for the defense was Columbus Police Detective Steven Eppert. Detective Eppert was involved in the investigation of Hamber's shooting. Detective Eppert testified that one shell casing was found at the crime scene, in the courtyard area of the apartments on a metal grate.
The jury was charged as to the elements of both aggravated murder and murder. Following deliberations, the jury returned verdicts finding defendant guilty of the lesser-included offense of murder. The jury also found defendant guilty of discharging a firearm at or into a habitation.
On appeal, defendant sets forth the following two assignments of error for review:
ASSIGNMENT OF ERROR I
 THE TRIAL COURT ERRED WHEN IT ENTERED JUDG-MENT AGAINST THE DEFENDANT, WHEN THE EVI-DENCE WAS INSUFFICIENT TO SUSTAIN A CONVICTIOIN AND WAS NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.
 ASSIGNMENT OF ERROR II APPELLANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH AMEND-MENT TO THE UNITED STATES CONSTITUTION, AND SECTION 10 ARTICLE ONE OF THE OHIO CON-STITUTION, BY TRIAL COUNSEL'S FAILURE TO REQUEST A LESSER INCLUDED JURY INSTRUCTION ON INVOLUNTARY MANSLAUGHTER, IT WAS ALSO PLAIN ERROR FOR THE TRIAL COURT TO FAIL TO INCLUDE SAID INSTRUCTION IN ITS CHARGE TO THE JURY.
Under his first assignment of error, defendant challenges both the weight and sufficiency of the evidence presented to support his conviction.
At the outset, we note the separate standards of review for sufficiency and weight of the evidence. In State v. Martin (Apr. 19, 2001), Franklin App. No. 00AP-836, unreported, this court stated:
 * * * In determining the sufficiency of the evidence, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." * * * However, "[u]nlike a challenge to the sufficiency of the evidence, which attacks the adequacy of the evidence presented, a challenge to the manifest weight of the evidence attacks the credibility of the evidence presented." * * * When reviewing the manifest weight of the evidence, an appellate court sits as a thirteenth juror; the reviewing court weighs the evidence and all reasonable inferences, considers the credibility of all witnesses and determines whether, in resolving conflicts, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. * * * Further, "[t]he discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." * * *
Defendant argues that there were no witnesses who actually saw defendant fire a shot through the door of the victim's apartment. Defendant further argues that two of the state's witnesses, Hodges and Williams, had been smoking crack that day, and that neither witness initially came forward with evidence. Defendant maintains that, although the jury obviously believed the "jail-house opportunists" who testified against defendant at trial, there was insufficient evidence to show intent to kill. Specifically, defendant argues that shooting through a door and striking someone in the head is a "fluke," and that, although the victim was tall, the bullet hole, high in the door, more logically weighs in favor of an intent not to hit anyone in the house. Finally, defendant maintains that the greater weight of the evidence supports a conviction for involuntary manslaughter.
In the present case, defendant was convicted of murder, which is defined under Ohio law as purposely causing the death of another. R.C.2903.02. At trial, the state presented a number of witnesses who placed defendant at the victim's apartment. Willie Hodges testified that defendant came to Hamber's door asking about a shirt. According to Hodges, defendant left with the shirt, but returned a few minutes later because he did not like the way Hamber spoke to him. Hamber asked, "[w]hat are you going to do, are you going to shoot me?" (Tr. at 80.) Shortly thereafter, Hodges heard a shot fired.
Matthew Williams had also been at Hamber's apartment that day when defendant first came to Hamber's door requesting a shirt. Williams, who had left Hamber's apartment prior to the shooting, was at a nearby apartment when he heard arguing. A female acquaintance of defendant, who was at the apartment with Williams, also heard the arguing and she "jumped up and tried to get out of the house to try to calm him [defendant] down * * * [b]ut the gun went off * * * before we could get there." (Tr. at 176.) After the shot was fired, Williams saw defendant walking away with the female. William Huff, a neighbor of Hamber, was in his apartment at the time of the shooting. Huff heard a shot fired, and he later observed defendant walking from the area, "[l]ooking back up towards the apartment and putting his hand back in his shirt." (Tr. at 38.)
Lee Gill and Thomas Reed, both inmates who spent time with defendant in the Franklin County Jail following the incident, testified that defendant admitted to the shooting. According to Gill, defendant related to him that, after initially arguing with Hamber, defendant started walking down the stairs, but when further words were exchanged defendant "whipped out his gun" and "headed back to the house and reached up and shot him." (Tr. at 138.) Reed also testified as to what defendant told him while in jail. According to Reed, when defendant went to the door, the victim saw that defendant had a weapon and he tried to shut the door. Defendant related to Reed that he "fired up like this * * * aiming towards the head." (Tr. at 253-254.)
Evidence sufficient to support a criminal conviction may be "direct, circumstantial or both." State v. Davis (Sept. 24, 1998), Franklin App. No. 98AP-192, unreported. Under Ohio law, "[c]ircumstantial and direct evidence possess the same probative value," and "[w]hen the state relies on circumstantial evidence to prove the essential elements of its case, there is no need for such evidence to be irreconcilable with any reasonable theory of defense in order to support a conviction." Id., citing State v. Jenks (1991), 61 Ohio St.3d 259. Further, direct evidence is not necessary to prove intent; rather, intent can "be deduced from `all the surrounding circumstances, including the instrument used to produce death, its tendency to destroy life if designed for that purpose, and the manner of inflicting a fatal wound.'" State v. Robinson (1999),132 Ohio App.3d 830, 838. Finally, an individual is "`presumed to intend the natural, reasonable and probable consequences of his acts.'" Id.
Reviewing the evidence in a light most strongly in favor of the state, as we must in considering a sufficiency claim, we find that there was sufficient evidence to support the jury's conclusion that defendant was guilty of murder beyond a reasonable doubt. We reject defendant's characterization of the act of shooting through a door and hitting someone in the middle of the forehead as merely a "fluke." In Robinson, supra, at 839, the court held that a defendant's act of firing shots through a door, "knowing someone was standing on the other side, provided a strong indication that [defendant] intended to kill someone" (even if not necessarily the person defendant shot). Thus, in Robinson, there was sufficient circumstantial evidence for the trier of fact to find that defendant acted purposely. In the present case, there was evidence that, if believed, indicated that defendant thought he was aiming at the victim's head as he shot toward the door, and under the facts presented a jury could have found that defendant acted with purpose to kill.
In challenging his conviction as against the manifest weight of the evidence, defendant argues that the witnesses who were at the apartment on the date of the shooting were either intoxicated or under the influence of drugs. Defendant also assails the reliability of the testimony of Gill and Reed, who both related that defendant confessed to the shooting during defendant's pretrial detention in the Franklin County Jail. However, while defendant attacks the credibility of the state's witnesses, the jury was able to observe these witnesses and determine whether they were believable. Such assessment of credibility was within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. See, also, State v. Nields (2001), 93 Ohio St.3d 6, 28 (credibility of jailhouse "snitch" was a question for the trier of fact to determine). Here, we cannot conclude that the jury lost its way in reaching its verdict, and we decline to substitute our judgment for that of the trier of fact.
Defendant also contends that the facts of this case more properly support a conviction for involuntary manslaughter rather than murder. We note that no request was made by defendant at trial for a jury instruction on involuntary manslaughter and, thus, this court's review is under a plain error standard. Involuntary manslaughter is defined as causing the "death of another * * * as a proximate result of the offender's committing or attempting to commit a felony." R.C. 2903.04(A). Defendant, noting that he was also convicted of discharging a firearm into a habitation, argues that the greater weight of the evidence indicates a killing occurring as a proximate result of the commission of a felony.
In the present case, as noted by the state, the defense sought to attack the identification testimony of the witnesses and, thus, defendant's trial strategy was to convince the jury that he was not the shooter. Consequently, the defense did not attempt to prove that whoever fired the shot, which struck the victim in the middle of the forehead, did not act in a purposeful manner. Here, an instruction on involuntary manslaughter would have conflicted with defendant's theory that he did not fire the weapon. See State v. Thaxton (June 25, 1993), Montgomery App. No. 13589, unreported (where there was no evidence of accident or self-defense, and defendant argued there was evidence to find he did not fire fatal shot, instruction on involuntary manslaughter would have been improper; if jury concluded defendant did not fire fatal shot, they could not also reasonably convict defendant of involuntary manslaughter which requires proof of an act proximately resulting in death). Finally, "the mere possibility that the jury might have reached a different conclusion is not sufficient to sustain the plain error standard." State v. Carr (Aug. 23, 2001), Franklin App. No. 00AP-1235, unreported. Under the facts of this case, an instruction on involuntary manslaughter would have conflicted with the defense theory, and defendant cannot show plain error by the trial court's failure to provide an instruction on that lesser-included offense.
Accordingly, we conclude that there was sufficient evidence to support defendant's conviction and, further, that the conviction was not against the manifest weight of the evidence. Based upon the foregoing, defendant's first assignment of error is without merit and is overruled.
Under his second assignment of error, defendant raises a claim of ineffective assistance of trial counsel.
In order for a criminal defendant to prevail on a claim of ineffective assistance of counsel, defendant must meet the two-prong test set forth by the United States Supreme Court in Strickland v. Washington (1984),466 U.S. 668. Under the first prong, "[c]ounsel's performance will not be deemed ineffective unless and until counsel's performance is proved to have fallen below an objective standard of reasonable representation[.]" State v. Bradley (1989), 42 Ohio St.3d 136, paragraph two of the syllabus. Under the second prong of the test, defendant is required to establish prejudice arising from trial counsel's performance. Id.
In the present case, defendant contends that his trial counsel was ineffective in failing to request an instruction on involuntary manslaughter. Thus, in order to meet the Strickland standard, defendant "must show both that the failure to request the instruction constitutes an unprofessional error on the part of counsel, and in the absence of such error there is a reasonable probability that the outcome of the trial would have been different." Carr, supra. Ohio courts have held that the decision of trial counsel not to request an instruction on a lesser-included offense can be "a matter of trial strategy and does not deprive a defendant of effective assistance of counsel." State v. Wheeler (Feb. 7, 2001), Cuyahoga App. No. 66923, unreported. See, also, State v. Griffie (1996), 74 Ohio St.3d 332, 333. ("Failure to request instructions on lesser-included offenses is a matter of trial strategy and does not establish ineffective assistance of counsel.")
As noted under the first assignment of error, defendant's strategy was to discredit the identification testimony of the state's witnesses in an effort to show that defendant was not the shooter. In light of the defense that someone other than defendant shot the victim, a request by defense counsel for an instruction on involuntary manslaughter would have been inconsistent with the defense strategy. Stated otherwise, it would be inconsistent for defendant to claim he did not commit the act giving rise to the charged offense, but then to claim he was entitled to an instruction on a lesser-included offense, which could only be found if defendant actually was the shooter. See, e.g., State v. McKinzie (June 5, 2001), Franklin App. No. 00AP-1182, unreported (trial counsel's decision not to request instruction on voluntary manslaughter that would conflict with theory presented at trial was a matter of reasonable trial strategy; an instruction on voluntary manslaughter would have been completely inconsistent with defense theory and forced appellant's counsel to argue both that his client did not commit the murder but, if he did, he had been provoked into a sudden fit of rage by the victim). Here, where seeking a lesser-included instruction would have been inconsistent with the defense theory, the failure of counsel to request such an instruction did not constitute ineffective assistance of counsel.
Accordingly, defendant's second assignment of error is without merit and is overruled.
Based upon the foregoing, defendant's first and second assignments of error are overruled and the judgment of the Franklin County Court of Common Pleas is hereby affirmed.
Judgment affirmed.
TYACK and LAZARUS, JJ., concur.